IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAMELA TRUNZO, individually,           )
ROBERT TRUNZO, individually, and       )
GINA TRUNZO, a minor, by               )
PAMELA and ROBERT TRUNZO,              )
her parents and natural guardians,     )
              Plaintiffs,      )
                                )
          v.                     )          CV-04-1789
                                )
ALLSTATE INSURANCE COMPANY,            )
                                )
              Defendant.        )

<u>MEMORANDUM ORDER</u>

CONTI, District Judge

*Introduction*

The instant action arises out of an automobile accident involving Micaela DeSouza ("Micaela") in which Pamela Trunzo, one of the plaintiffs, was injured.  Pending before the court are the parties' cross-motions for summary judgment concerning whether defendant Allstate Insurance Company ("defendant") breached a contractual duty allegedly owed to Micaela by refusing to defend or indemnify her for claims arising from the accident.  Defendant contends that it is entitled to summary judgment on the grounds that Micaela was not an "insured person" under Allstate Automobile Insurance Policy Florida AU 109-2 (the "Policy") and that, even if she was, the vehicle that she negligently operated was not an "insured auto" under the Policy.  (Doc. No. 32 at 4-16).  Pamela Trunzo, Robert Trunzo and Gina Trunzo ("plaintiffs") contend that they are entitled to partial summary judgment regarding the "insured auto" issue and that there is a

genuine factual dispute regarding the "insured person" issue, thereby precluding summary judgment as sought by defendant. (Doc. No. 39 at 14-22). The material facts regarding the "insured auto" issue are not in dispute, while the facts regarding the "insured person" issue are disputed in a significant manner. (Doc. Nos. 46-47). This court finds that the factual dispute concerning the "insured person" issue precludes a grant of summary judgment on that issue, and that plaintiffs are entitled to the grant of summary judgment in their favor with regard to the "insured auto" issue. The court will grant plaintiffs' motion for partial summary judgment and deny defendant's motion for summary judgment.

### *Background*

Saulo DeSouza ("Saulo") and Jacira Antonelli ("Antonelli") are both natives and citizens of Brazil. Their daughter, Micaela, was born in the United States and, by virtue of the Citizenship Clause of the Fourteenth Amendment, is a citizen of the United States. She was born in October 1985, in Pittsburgh, Pennsylvania. (Doc. No. 35, Ex. A at 17). Her parents were divorced when she was still very young. (*Id.* at 26). Antonelli lives in Monroeville, Pennsylvania, and Saulo lives in Corral Spring, Florida. (Doc. No. 39, Ex. I at 1). Micaela attended elementary school in the Pittsburgh area, and she graduated from Gateway Junior High School in 1999. (Doc. No. 39, Ex. B at 15). After graduation, she traveled to Brazil for what was supposed to be a summer vacation. (*Id.* at 16). Upon her arrival in Brazil, Micaela decided to remain there with relatives because of her desire for the "tropical lifestyle." (*Id.* at 17). She attended school in Brazil from 1999-2002. (*Id.* at 20). After deciding that she wanted to attend college in the United States, Micaela concluded that it was in her best interest to do her final year of high school in an American school. (*Id.* at 26). Consequently, she moved in with her mother

and Robert Mylnar ("Mylnar"), her mother's boyfriend, in 2002. (*Id.* at 40). They lived in Monroeville, and Micaela attended Gateway Senior High School ("Gateway H.S."). (*Id.* at 27). Apparently, Mylnar made it clear to Antonelli that he only wanted Micaela to live with them for the duration of the 2002/2003 school year. (Doc. No. 39, Ex. A at 62, Ex. B at 41, Ex. C at 13). Micaela graduated from Gateway H.S. in early June 2003. (Doc. No. 39, Ex. B at 48).

It is clear that Micaela intended to move to Florida after her graduation. (*Id.* at 48). Her father wanted her to move in with him, and she visited him on a frequent basis from January to June 2003. (*Id.* at 42-49). While in high school, Micaela applied for admission to Florida International University, but she was not accepted. (Doc. No. 39, Exhibit B at 75-77). The question whether she had actually moved in with her father as of July 12, 2003, is in dispute. It, however, is undisputed that Micaela traveled to Florida after her graduation and stayed for approximately two weeks. (Doc. No. 46 at 6). She returned to Pennsylvania in late June, apparently because she wanted to attend some of her classmates' graduation parties. (Doc. No. 32, App. F at 26-27). During June and July 2003, Micaela was spending some of her time in Pennsylvania and some of her time in Florida. (*Id.* at 48). By August 2003, Micaela was clearly living with her father in Florida. (*Id.*). In September 2003, she started working for Debt Relievers Debt Consolidation in Boca Raton, Florida. (Doc. No. 39, Ex. B at 79).

On July 12, 2003, while in Pennsylvania, Micaela drove Mylnar's car. She did so even though she had no driver's license and was not permitted to drive Mylnar's car. (Doc. No. 32, App. G at 87). Subsequently, an accident occurred which was reported as follows:

> On 7-12-03 at approx. 9:20 PM, Pamela Trunzo legally parked her pick-up truck (Unit 2) along the westbound curbline of Broadway Street in Pitcairn. Trunzo (Unit 3) then walked over to a nearby ATM Bank Machine, to complete a banking

3

transaction.  Upon completion of this transaction, Trunzo walked along the
driver's side of her vehicle.  At this same point in time, Unit #1 was traveling
westbound along Broadway Street.  The operator of Unit 1 failed to keep her
vehicle in the proper lane of travel.  The right side (passenger side) of Unit 1 then
sideswiped the left side (driver's side) of Unit 2.  At the time of this collision,
Pamela Trunzo was caught between the two motor vehicles.  Unit 1 subsequently
struck Trunzo.  The collision caused life threatening injuries to Pamela Trunzo.

(Doc. No. 32, App. D).  Micaela was the driver of "Unit 1."  Mylnar's vehicle was insured

through State Farm, which denied coverage for the accident on the ground that Micaela was not a

permissive user of the vehicle and, consequently, did not qualify as an "insured" under the

insurance policy.  (Doc. No. 39 at 2  n.2).  That denial is not at issue in this case.

Ultimately, a $2.4 million judgment was entered against Micaela in the Court of Common

Pleas, Westmoreland County, Pennsylvania, as a result of legal action taken against her by

plaintiffs.  Defendant is an insurance company from which Micaela's father, Saulo, purchased the

Policy.  Plaintiffs are the assignees of the rights of Micaela against defendant.  Plaintiffs allege

that defendant wrongfully, and in bad faith, refused to defend or indemnify Micaela for claims

resulting from the accident.  The Policy provides, in pertinent part, as follows:

> **Definitions Used Throughout the Policy**
> The following definitions apply throughout the policy unless
> otherwise indicated.  Defined terms are printed in bold face type.
>
> 1.  **Allstate**, **we**, **us**, or **our** means the company shown on the
>     Policy Declarations.
> 2.  **Auto** means a land motor vehicle designed for use
>     principally upon public roads.
> 3.  **Resident** or **reside** means the physical presence in your
>     household with the intention to continue living there.  Your
>     unmarried dependent children while temporarily away from
>     home will be considered **resident(s)**, if they intend to
>     continue to live in **your** household.
> 4.  **Utility auto** means an auto of the pick-up body, sedan
>     delivery or panel truck type.  This auto must have a gross

vehicle weight of 10,000 pounds or less, according to the manufacturer's specifications.

5.      **You** or **your** means the policyholder named on the Policy Declarations and that policyholder's **resident** spouse.

\*\*\*\*

**Allstate** will pay for all damages an **insured person** is legally obligated to pay because of **bodily injury** or **property damage**.

*Under these coverages, your policy protects an **insured person** from claims for accidents arising out of the ownership, maintenance or use, loading or unloading of the **auto we** insure.*

***We** will defend an **insured person** if sued as the result of a covered **auto** accident.  **We** will defend that person at our own expense, with counsel of our choice and, may settle any claim or suit if we feel this is appropriate.  **We** will not defend an **insured person** sued for damages which are not covered by this policy.*

\*\*\*\*

2.      **Insured auto** means:

        \*\*\*\*

        d.      A non-owned **auto** used by you or a **resident** relative with the owner's permission.  This **auto** must not be available or furnished for the regular use of an **insured person**; or

\*\*\*\*

3.      **Insured person** means:
        a.      While using your **insured auto**
                (i)      **you**,
                (ii)     any **resident**, and
                (iii)    any other person using it with your permission;

        b.      *While using a non-owned **auto***
                *(i)      **you**,*
                *(ii)     any **resident** relative using a four wheel*

5

> *private passenger **auto** or **utility auto**; or*
>
> c.    Any other person or organization liable for the use
>        of an **insured auto** if the **auto** is not owned or hired
>        by that person or organization, provided the use is
>        by an **insured person** under a. or b. above and then
>        only for that person's acts or omissions.

(Doc. No. 32, App. A)(boldface type in original; emphasis added).[1]  Plaintiffs contend that

Micaela was an "insured person" as defined by defendant's policy, and that she was entitled to

coverage despite the fact that she did not have Mylnar's permission to operate the vehicle.

Defendant contends that Micaela was not an "insured person" and that, even if she was, the

vehicle that she was driving did not qualify as an "insured auto."  Plaintiffs allege that defendant

breached its contractual obligation to Micaela under Florida law.  Plaintiffs also allege that, in so

doing, defendant acted in bad faith for purposes of the Pennsylvania Bad Faith Statute, which is

codified at 42 PA. CONS. STAT. § 8371.

### Standard of Review

        Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if,

drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law." FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the mere

existence of some disputed facts, but will be defeated when there is a genuine issue of material

fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In determining whether the

dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of

---

[1]The portions of the Policy being construed by the court are those which appear in italics.

the matter, but only to determine whether the evidence of record is such that a reasonable jury

could return a verdict for the nonmoving party.  *Id.* at 249.

***Discussion***

The instant case is before the court because, on November 22, 2004, defendant filed a

notice of removal from the Court of Common Pleas, Westmoreland County, Pennsylvania,

pursuant to 28 U.S.C. § 1441.  Jurisdiction is predicated on 28 U.S.C. § 1332(a)(1).  Since

jurisdiction in this case is based upon diversity of citizenship, the court must apply the choice of

law rules applicable in the Commonwealth of Pennsylvania.  *Klaxon Co. v. Stentor Electric*

*Manufacturing Co., Inc.*, 313 U.S. 487, 496-97 (1941).  Under Pennsylvania law, "[w]hen the

issue in the case is coverage under an insurance policy, the case is a contract matter."  *Wilson v.*

*Transport Ins. Co.*, 889 A.2d 563, 571 (Pa. Super. Ct. 2005).  Consequently, "the court must

apply the law of the state having the most significant contacts or relationships with the contract

and not the underlying tort."  *Wilson*, 889 A.2d at 571.  Even though the accident occurred in

Pennsylvania, Florida is the state which has the most significant contacts and interests regarding

the construction of the insurance contract.  The parties are in agreement that Florida law is

applicable to the breach of contract action and that Pennsylvania law is applicable to the statutory

action pursuant to 42 PA. CONS. STAT. § 8371.  Accordingly, the court will proceed to address

each claim in issue.

**I.      *Breach of Contract Claim***

There are two issues in dispute with respect to the construction of the applicable

insurance contract.  The interpretation of an insurance contract is a question of law for the court

to decide.  *Vector Products, Inc. v. Hartford Fire Ins. Co.*, 397 F.3d 1316, 1318 (11th Cir.

7

2005)(case governed by Florida law).  The question whether Micaela was an "insured person" within the meaning of the contract is disputed in this case.  The resolution of that issue turns on whether Micaela, at the time of the accident, had already moved in with her father.  A determination that defendant is entitled to summary judgment with regard to the "insured auto" issue, however, would render the residency inquiry inconsequential.  For this reason, the court will first address the question whether the insurance contract should be construed to extend coverage to Micaela despite the fact that she did not have Mylnar's permission to use his car.  In so doing, for purposes only of that issue, the court will assume *arguendo* that Micaela had already moved into her father's home as of July 12, 2003, and was, therefore, an "insured person."

**A.      The Ambiguity of the Phrase "Auto We Insure"**

Under the law of Florida, "insurance contracts are construed according to their plain meaning."  *Taurus Holdings, Inc. v. United States Fidelity and Guaranty Co.*, 913 So.2d 528, 532 (Fla. 2005).  "If the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as it was written."  *Travelers Indemnity Co. v. PCR Inc.*, 889 So.2d 779, 785 (Fla. 2004).  "When language in an insurance policy is ambiguous, a court will resolve the ambiguity in favor of the insured by adopting the reasonable interpretation of the policy's language that provides coverage as opposed to the reasonable interpretation that would limit coverage."  *Id.* at 785-86.  This standard applies because the insurance company, as the drafter of the policy, has a significantly greater opportunity to choose the applicable language needed to secure its interests.  Nevertheless, while "ambiguous provisions are construed in favor of

coverage, to allow for such a construction the provision must actually be ambiguous." *Taurus Holdings, Inc.*, 913 So.2d at 532.  "[C]ourts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Id.* at 532 (internal quotation marks omitted).

The legal issue presented in this case is relatively straightforward.  Defendant contends that since Micaela did not have Mylnar's permission to use the vehicle, she was not operating an "insured auto" at the time of the accident.  This assertion is based upon the fact that the applicable definition of the term "insured auto" includes the words "with the owner's permission."  Plaintiffs do not dispute that Mylnar's car was not an "insured auto" as defined by the Policy.  Instead, they argue that since defendant failed to use the term "insured auto" in the applicable portions of the insurance contract,[2] they do not have to show that Micaela was operating an "insured auto."  Defendant argues that the Policy's definition of the term "insured auto" is incorporated within the words "auto we insure."

The problem with defendant's argument is that it seeks to incorporate the definition of a specific term even where that term does not appear in the relevant language.  Not only is the defined term missing from the contractual language relied upon by defendant, but it is also missing from definition 3.b. (using non-owned auto) of the term "insured person."  Defendant complains that plaintiffs' reading of the Policy would result in coverage for bodily injury or property damage caused by an "insured person" regardless of whether the vehicle that he or she operates qualifies as an "insured auto."  In the case of Micaela, that is true.  Nevertheless, that is not true in instances where the driver is an "insured person" under definitions 3.a. (using insured

_____

[2]See supra n.1.

auto) or 3.c. (others listed for use).  In order for a driver to be an "insured person" within the meaning of either definition 3.a. (using insured auto) or definition 3.c. (others listed for use), he or she must be operating an "insured auto."  Under these circumstances, the reach of the "insured person" definition is limited by the inclusion of the term "insured auto."  In other words, for purposes of definitions 3.a. (using insured auto) and 3.c. (others listed for use), one cannot be an "insured person" unless he or she is operating an "insured auto."  For purposes of definition 3.b. (using non-owned auto), however, one can be an "insured person" even though he or she is not operating an "insured auto."  In that instance, the insured or resident relative qualifies as an "insured person" merely by operating a "non-owned auto," which is not specifically defined anywhere in the Policy.

Consequently, plaintiffs' interpretation of the Policy would not render the words "with the owner's permission" meaningless or superfluous.  Those words, as they appear in definition 2.d. (incorporating permissive use requirement) of the term "insured auto," would limit the reach of definition 3.c. (others listed for use) of the term "insured person."  Under definition 3.c. (others listed for use), one cannot be an "insured person" without operating an "insured auto."  In contrast, under definition 3.b. (using non-owned auto), one can be an "insured person" while operating a "non-owned auto," even if that vehicle does not qualify as an "insured auto."

It is clear that, where necessary, qualifying language has been used in various definitions.  For instance, under definition 3.a. (using insured auto), Saulo was an "insured person" whenever he used his own "insured auto."  Assuming, as the court must for this issue, that Micaela was a "resident" for purposes of the Policy, she also would have qualified as an "insured person" under definition 3.a. (using insured auto) while using Saulo's "insured auto."  A non-resident would

10

have qualified under definition 3.a. (using insured auto) as an "insured person" only while using the vehicle with Saulo's permission by reason of definition 3.a.(iii) containing the words "using it with your permission."  Definition 3.b. (using non-owned auto) says nothing about whether the "non-owned auto" must be used with the owner's permission.  Instead, under definition 3.b.(ii), Micaela qualified as an "insured person" at the time of the accident so long as Mylnar's vehicle was "a four wheel private passenger auto or utility auto."

Notwithstanding Micaela's status as an "insured person," it remains to be determined whether she was entitled to coverage even though she was not operating an "insured auto" at the time of the accident.  In resolving this issue, the court is mindful that provisions of an insurance contract must not be read in isolation and must, to the extent possible, be read in context.  *Auto-Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla. 2000).  In any event, however, it is difficult to fathom how this principle helps defendant's argument more than it hurts it.  The term "insured auto" appears nowhere in the specific contractual language at issue in this case.[3]  Furthermore, the language relied upon by defendant, while omitting the defined term allegedly incorporated therein, specifically uses two other terms which are themselves expressly defined within the Policy.  "Auto" and "we" are not only defined terms, but they are printed "in bold face type."  This indicates that they are used not for the purpose of incorporating the definition of a third term, but rather as terms of art in a manner consistent with their own independent definitions.  In order to construe the Policy in the manner proposed by defendant, the court would have to read the definition of one term into a phrase which includes two distinct terms, each of which has its own definition.

---

[3]See supra n.l.

In support of its motion for summary judgment, defendant relies on several decisions of Florida appellate courts. These decisions, however, do not provide the answer to the question presented in this case. The issue presently before the court is whether the definition of a specifically defined term appearing within the text of an insurance contract can be construed to limit the reach of a phrase which not only omits that same defined term, but also includes two other defined terms which are not limited by the qualifying language contained within the definition of the term which is not present. The decisions cited by defendant do not purport to resolve this issue. The decision with the closest facts cited by defendant is *Caldwell v. Allstate Insurance Co.*, 417 So.2d 1040 (Fla. Dist. Ct. App. 1982). Defendant argues that, in *Caldwell*, the District Court of Appeal of Florida, First District, construed nearly identical language to mean that the term "covered auto" was incorporated within the words "auto we insure." *Id.* at 1040-41. *Caldwell* determined that the vehicle involved in that case was a "covered auto" as defined by the policy, thereby making any inquiry regarding the incorporation of the defined term within the phrase "auto we insure" inconsequential. *Id.* It is not clear that this issue was even raised or argued by the parties in *Caldwell*. Even if this court were otherwise inclined to assume that it was, defendant apparently acknowledges that it was not in the following passage:

> Furthermore, George Naftzinger of Allstate, who occupies a position as Claims Process Specialist (CPS) for the entire Florida region, testified in his deposition that he is not aware of any claims or lawsuits in Florida which have advanced such an argument, or any case law in Florida which have interpreted the Florida AU109 or predecessor policy in a manner being suggested by the Trunzos, on behalf of Micaela DeSouza, in this case. See D.T. George Naftzinger p. 79, App. L. The reason for that is obvious: the argument wholly lacks merit.

12

(Doc. No. 32 at 10).[4]  Accordingly, the court is not convinced that the issue presented in this case was actually decided in *Caldwell*, nor is it convinced that the dicta in *Caldwell* provides much guidance as to how the present case should be resolved under Florida law.

A more recent decision which sheds some light on this issue is *Allstate Insurance Co. v. Morgan*, 870 So.2d 2 (Fla. Dist. Ct. App. 2003).  In that decision, the District Court of Appeal of Florida, Second District, determined that the meaning of a defined term was clear and unambiguous, notwithstanding the presence of a different definition for a similar term in another portion of the insurance policy.  The court stated:

> Here, the term 'insured motor vehicle' was specifically defined, and that definition was clear and unambiguous.  It simply could not be clouded by the definition of the phrase "insured auto" elsewhere in the policy.

*Id.* at 4.  This language, although determining that an insurance contract was not ambiguous, suggests that Florida law emphasizes the importance of the use of defined terms appearing within the text of an insurance policy.  In the instant case, the terms "auto" and "we" are specifically defined, and the definition of neither term includes the qualifying language present in the definition of the term "insured auto."  Therefore, the discussion in *Allstate Insurance Co.* tends to favor the position advanced by plaintiffs in the instant case.

Defendant relies on *Sphinx International, Inc. v. National Union Buyer Insurance Co.*, 412 F.3d 1224 (11th Cir. 2005), for the proposition that, under Florida law, "[t]he mere failure to provide a definition for a term involving coverage does not necessarily render the term ambiguous."  *Id.* at 1229; (Doc. No. 38 at 4).  In this case, however, the court is not presented

---

[4]This passage, which appears in defendant's brief, indicates that the contractural interpretation issue presented in this case has never been decided before.  Consequently, it is fair to conclude that it was not decided in *Caldwell*.

with a situation in which an unambiguous term is used without an explicit definition.  Instead, the court is presented with a situation in which a term *is defined in the contract* but is nevertheless *omitted* from the portion of the contract at issue.

In analyzing the issue presented in the instant case, this court is mindful that, under Florida law, "[a] reasonable interpretation of a contract is preferred to an unreasonable one." *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So.2d 938, 941 (Fla. 1979). Defendant contends that the interpretation advocated by plaintiffs is unreasonable because it would extend coverage to an "insured person" who operates a "non-owned auto," regardless of whether that "auto" qualifies as an "insured auto" as defined by the Policy.  The reasonableness of the contract's construction, however, must be viewed in light of what the contract actually provides.  The defined term which defendant relies upon does not appear anywhere in the contractural language which is specifically at issue.[5]  The drafter of an insurance contract is in a much better position to choose language which addresses its interests than is the insured party. *Fireman's Fund Ins. Cos. v. Pearl*, 540 So.2d 883, 884 (Fla. Dist. Ct. App. 1989).  It is for this reason that ambiguous provisions in an insurance contract are construed against the drafter and in favor of coverage.

In the instant case, defendant could have protected its interests in one of three ways. First, it could have used the term "insured auto" instead of the phrase "auto we insure" in the relevant sentence of the Policy.  That is the most obvious way in which defendant could have avoided coverage in a case such as this.  Second, defendant could have qualified definition 3.b. (using non-owned auto) of the term "insured person" by specifying that the "non-owned auto"

---

[5] *See* supra n.1.

operated by the relevant person must be an "insured auto" as defined by the Policy.[6]  After all,

definitions 3.a. (using insured auto) and 3.c. (others listed for use) are so qualified.  Although

defendant contends that the "insured person" and "insured auto" inquiries should be treated as

separate issues, it is clear that an individual *cannot possibly be* an "insured person" under

definitions 3.a. (using insured auto) and 3.c. (others listed for use) without operating an "insured

auto."  The "insured auto" definition is specifically incorporated within definitions 3.a. (using

insured auto) and 3.c. (others listed for use) of the term "insured person."  Except for a situation

in which a driver qualifies as an "insured person" only under definition 3.b. (using non-owned

auto), the "insured person" and "insured auto" issues are completely intertwined.  This suggests

that the issues cannot be separated as neatly as defendant appears to suggest.  Third, defendant

could have specifically excluded coverage in a case such as this by drafting an exclusion from

coverage provision.  In so observing, the court is mindful that, under Florida law, "the existence

or nonexistence of an exclusionary provision in an insurance contract is not at all relevant until it

has been concluded that the policy provides coverage for the insured's claimed loss."  *Siegle v.*

*Progressive Consumers Ins. Co.*, 819 So.2d 732, 740 (Fla. 2002).  Nevertheless, in the instant

case, defendant asserts that the Policy, which it drafted, means something other than what it says.

The ease with which this apparent ambiguity could have been avoided tends to favor the position

---

[6]It is worth noting that defendant referred to Mylnar's vehicle as a "non-owned" auto for purposes of definition 3.b. when it disclaimed "liability or obligation" with respect to Micaela's accident.  (Doc. No. 39, Ex. K). In a letter dated September 22, 2003, Timothy J. McCarten, an Allstate employee, explained that the disclaimer was being made "because Micaela DeSouza [did] not meet the definition of an 'insured person' as indicated in Saulo DeSouza's policy." (Doc. No. 39, Ex. K).  Therefore, the construction of the Policy adopted by the court is consistent with defendant's construction of the Policy at the time that the claim at issue was originally denied.  Mr. McCarten's letter made no mention of the "insured auto" issue that has been raised in defendant's motion for summary judgment.  Defendant's assertion that the Policy "unambiguously" required Micaela to have Mylnar's permission to operate the vehicle in order for coverage to exist is severely undercut by defendant's own apparent assumption that Micaela was operating a "non-owned" auto at the time of the accident.

advanced by plaintiffs in this case.

The difference between the two competing constructions is not as drastic as defendant suggests.  A determination that Micaela was entitled to coverage solely on the basis of her status as an "insured person" would extend coverage to her regardless of whether she had Mylnar's permission to use his vehicle.  Such a construction of the Policy would, as defendant asserts, "lead to the result that Allstate would cover Micaela DeSouza for her use of any vehicle owned by anyone anywhere in the United States." (Doc. No. 32 at 9).  The construction advanced by defendant is also broad, with two qualifications.  Under defendant's reading of the Policy, an "insured person" who uses a "non-owned auto" is covered for his or her "use of any vehicle owned by anyone anywhere in the United States," provided that: 1) the vehicle is used "with the owner's permission," and 2) it is not "available or furnished for the regular use of [that] insured person."  Even under defendant's proposed construction, coverage would be limited more closely by the status of the person operating the vehicle than by the status of the vehicle itself.

The court concludes that the applicable language in the Policy is ambiguous.  Defendant's attempt to borrow the definition of a term which does not appear in the language at issue in this case is itself enough to establish that the Policy, as written, is unclear.  Given this ambiguity, the insurance contract must be "construed in favor of the insured and strictly against the drafter." *Taurus Holdings, Inc.*, 913 So.2d at 532.  For this reason, defendant's motion for summary judgment cannot be granted merely because Micaela did not have Mylnar's permission to operate his vehicle at the time of the accident.  Plaintiffs are entitled to partial summary judgment on this issue, and the phrase "auto we insure" will be interpreted in favor of the insured.  By granting partial summary judgment in favor of plaintiffs, the court is not deciding that defendant is liable

to plaintiffs.  Liability will depend upon whether Micaela was a "resident" of her father's

household as of July 12, 2003.

**B.      Residence Status of Micaela**

An examination of the record reveals that there are genuine issues of material facts in

dispute with respect to the question whether Micaela was a "resident" of her father's household

at the time of the accident.  At the outset, it is important to note that the words "residence,"

"resident" and "reside" can have very different meanings when they appear in different contexts.

The Citizenship Clause of the Fourteenth Amendment provides: "All persons born or naturalized

in the United States and subject to the jurisdiction thereof, are citizens of the United States and of

the State wherein they reside."  U.S. CONST. amend. XIV, § 1.  In the constitutional context, the

word "reside" has been construed coextensively with our nation's understanding of "domicile."

*Saenz v. Roe*, 526 U.S. 489, 504 (1999); *Milliken v. Meyer*, 311 U.S. 457, 463-64 (1940);

*Robertson v. Cease*, 97 U.S. 646, 648-51 (1878); *Smith v. Cummings*, 445 F.3d 1254, 1259-60

(10th Cir. 2006); *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857-58 (9th Cir. 2001).  "For

adults, domicile is established by physical presence in a place in connection with a certain state

of mind concerning one's intent to remain there."  *Mississippi Band of Choctaw Indians v.

Holyfield*, 490 U.S. 30, 48 (1989).  In other contexts, it has been recognized that "[d]omicile is

not necessarily synonymous with residence, and [that] one can reside in one place but be

domiciled in another."  *Id.* at 48.  In *Kiplinger v. Kiplinger*, 2 So.2d 870 (Fla. 1941), the Florida

Supreme Court stated that "[r]esidence indicates place of abode, whether permanent or

temporary."  *Id.* at 873.  The Florida Supreme Court went on to state that "[a] resident is one who

lives at a place with no present intention of removing therefrom," and that "[w]hether or not a

party is a resident is a question of law and fact to be settled or determined from the facts of each particular case."  *Id.* at 873-74.

In the present case, the court must determine whether the undisputed facts of record will support a finding that Micaela, at the time of the accident, was a "resident" of her father's household *as that term is defined in the Policy*.  In support of its motion for summary judgment, defendant places significant reliance on the standards discussed in *Dwelle v. State Farm Mutual Automobile Insurance Co.*, 839 So.2d 897 (Fla. Dist. Ct. App. 2003).  (Doc. No. 32 at 5-8).  In *Dwelle*, however, the District Court of Appeal of Florida, First District, was interpreting the word "relative" as it was defined in the applicable insurance policy.  *Id.* at 898-99.  The three-part test employed in that decision, which examined the alleged insured's "close ties of kinship," "fixed dwelling unit" and "enjoyment of all the living facilities," cannot be strictly applied to the instant case.  The applicable term in the instant case is "resident," and the Policy's definition of that term does not require a familial relationship as the term "relative" did in *Dwelle*.  Although defendant concedes that Micaela is Saulo's biological daughter, thereby establishing "close ties of kinship," close ties are not required under the Policy.  Although the applicable definition[7] is clarified by language indicating that an insured's "unmarried dependent children" are considered "residents" of the insured's household as long as they intend to continue living in the insured's household, the primary definition requires no familial link between the insured and his or her fellow

_____

[7]"**Resident** or **reside** means the physical presence in your household with the intention to continue living there.  Your unmarried dependent children while temporarily away from home will be considered  **resident(s)**, if they intend to continue to live in **your** household."  (Doc. No. 32, App. A)(boldface type in original).

"residents."  The applicable definition[8] of the term "insured auto," of course, uses the term "resident relative," thereby limiting the reach of that term in certain contexts.  As noted earlier, however, defendant's failure to use that defined term in the relevant portion of the Policy precludes reliance on the qualifying language in that definition.

The court points this out to illustrate that fact-specific decisions interpreting insurance contracts which differ from the present one do not control the interpretation of the language in dispute here.  The policy construed in *Dwelle* differs meaningfully from the one at issue in this case, and defendant's arguments undoubtedly blur the distinction between the general requirements of Florida law and the construction given by a Florida court to a *particular insurance contract*.  Defendant relies on the determination in *Dwelle* that the individual in question "was a relative living *primarily* with his insured parents at the time of the accident." (Doc. No. 32 at 6)(quoting *Dwelle*, 839 So.2d at 899).  Defendant's reliance on the word "primarily" is misplaced.  In *Dwelle*, the defined term "relative" required that the individual claiming coverage be someone "who resided primarily with" the insured person.  *Dwelle*, 839 So.2d at 898.  There is no similar language in the definition of the word "resident" in the Policy. Accordingly, strict application of the test used in *Dwelle* is inappropriate in the instant case. While Florida law is undoubtedly controlling, many of the decisions relied upon by the parties are of diminished precedential value in that they dealt with different language appearing in

---

[8]**Insured auto** means:

****

d.       A non-owned **auto** used by you or a **resident** relative with the owner's permission.  This **auto** must not be available or furnished for the regular use of an **insured person**...."
(Doc. No. 32, App. A)(boldface type in original).

different insurance contracts.  Florida law requires the court to adopt "a reasonable, practical and sensible interpretation [of the Policy] consistent with the intent of the parties."  *Siegle*, 819 So.2d at 736.  The court is not dealing with a constitutional or statutory provision which applies equally to *all* parties.  Instead, the court is being asked to construe a *particular* insurance contract agreed to by *particular* parties.

Under certain circumstances, a minor can be a resident of more than one household.  *Progressive Ins. Co. v. Estate of Wesley*, 702 So.2d 513 (Fla. Dist. Ct. App. 1997); *Alava v. Allstate Ins. Co.*, 497 So.2d 1286 (Fla. Dist. Ct. App. 1986); *Sutherland v. Glens Falls Ins. Co.*, 493 So.2d 87 (Fla. Dist. Ct. App. 1986).  A distinction must be made between where someone *resides* and where he or she is *domiciled*.  "Since most minors are legally incapable of forming the requisite intent to establish a domicile, their domicile is determined by that of their parents."  *Mississippi Band of Choctaw Indians*, 490 U.S. at 48.  An individual cannot have more than one domicile.  *Great Cruz Bay, Inc. v. Wheatley*, 495 F.2d 301, 306 n.7 (3d Cir. 1974).  One maintains his or her domicile until a new one is acquired.  *Mississippi Band of Choctaw Indians*, 490 U.S. at 48.  If no new domicile is acquired, the original domicile remains regardless of whether the person continues to *reside* there.  In contrast, it is entirely possible for a person to *reside* "in more than one place at the same time."  *Sutherland*, 493 So.2d at 87.

In the instant case, the dispute centers on language purporting to grant coverage.  With regard to the construction of insurance contracts, Florida law treats coverage clauses differently from exclusionary clauses, albeit both treatments favor the insured and not the insurance company.  In *Progressive Insurance Co. v. Estate of Wesley*, 702 So.2d 513 (Fla. Dist. Ct. App. 1997), the District Court of Appeal of Florida, Second District, stated:

> The court in *Alava* was concerned with an insurance policy which provided coverage for family members who were residents of the insured's household.  The Third District was addressing a grant of coverage, not an exclusion from coverage.  When dealing with grants of coverage, the courts should interpret the policy language broadly in favor of the existence of insurance, while limitations or exclusions should be interpreted narrowly against the insurer.  *Allstate Ins. Co. v. Neumann*, 435 N.E.2d 591 (Ind.App.1982).  The *Alava* court interpreted the policy language broadly in favor of coverage.  Unlike the court in *Alava*, we are dealing with a limitation on coverage; thus, the policy is being interpreted narrowly.

*Id.* at 515.  The court must interpret the Policy's definition of the word "resident" in conformity with the general rule that "[a]mbiguities are construed against the insurer and in favor of coverage."  *Taurus Holdings, Inc.*, 913 So.2d at 532.  Nothing in the Policy expressly prohibits an insured person from being deemed to be a "resident" of more than one household.[9]

With that in mind, the court turns to the dispute concerning Micaela's residence at the time of the accident.  It is undisputed that, as of July 12, 2003, Micaela was physically present in Pennsylvania.  The accident, of course, occurred in Pennsylvania.  It is likewise undisputed that she had traveled to Florida shortly after graduating from Gateway H.S., and that it was her intention to move to Florida *at some point*.  During her senior year, she applied for admission to Florida International University.  (Doc. No. 39, Ex. B at 75-77).  Whether she was already living in Florida is vehemently disputed by the parties.

An examination of the record indicates that the factual disputes at issue in this case are

---

[9]Micaela arguably violated Pennsylvania's Motor Vehicle Code when she drove without a valid Pennsylvania driver's license.  75 PA. CONS. STAT. § 1501(a).  75 PA. CONS. STAT. § 102 defines the term "resident" as follows: "A person dwelling permanently or continuously for a period exceeding 60 consecutive days within this Commonwealth, except that a person who regularly dwells in two or more states shall declare residence to be in any one of the states."  Since she had no valid Florida driver's license, she was not exempt from Pennsylvania's licensing requirements for purposes of 75 PA. CONS. STAT. § 1502(3).  The statutory definition of the word "resident" indicates that the Pennsylvania legislature intended for an individual to have only one "residence" for purposes of the Motor Vehicle Code.  The insurance contract drafted by defendant contains no similar limiting language.  For this reason, it is possible that, on July 12, 2003, Micaela was a "resident" of both her parents' households.

material to its outcome.  On August 19, 2003, Saulo indicated that Micaela had never lived at his house.  (Doc. No. 39, Ex. I at 3).  On that date, Saulo was briefly interviewed by Timothy J. McCarten, an Allstate employee.  Saulo denied that Micaela had ever lived with him even though she was actually there at the time of the telephone call.  (*Id.* at 6).  Plaintiffs contend that Saulo was attempting to distance himself from Micaela's accident because he was concerned about his immigration status.  (Doc. No. 41 at 6).  When Mylnar was deposed, he indicated that Micaela had not lived with him and Antonelli between her graduation date and the date of the accident. He stated that, during that period of time, Micaela had been "traveling back and forth to Florida." (Doc. No. 39, Ex. C at 20).  In her deposition, Antonelli indicated that Micaela started moving some of her belongings to Florida in December 2002, after deciding that she was going to move in with her father after graduating from Gateway H.S.  (Doc. No. 39, Ex. A at 49).  Antonelli further stated that Micaela had taken most of her belongings to Florida by July 12, 2003, and that she had come back to Pennsylvania only to attend "a few graduation parties and to get the rest of her stuff."  (*Id.* at 55).  Micaela indicated that she had been to Florida five times between the months of January and July 2003, and that she had moved some of her clothes there each time. (Doc. No. 39, Ex. B at 46-47).  Micaela further noted that she had often been absent from school during that period of time.  (Doc. No. 32, App. C at 45).  She stated that her intention had clearly been to move to Florida following her graduation from Gateway H.S., and that her return to Pennsylvania was for the purpose of attending graduation parties.  (Doc. No. 39, Ex. B at 48-49). While it is unclear whether Micaela was a "resident" of her father's household as of July 12, 2003, the court is convinced that plaintiffs have presented sufficient evidence to preclude the grant of summary judgment in favor of defendant.

The circumstances surrounding Micaela's statements to the police are also in dispute. Defendant asserts that, after the accident, Micaela provided the police with her mother's Monroeville address rather than her father's Florida address. (Doc. No. 46 at 4). This allegation is in contention. In her deposition, Officer Alice Panaro stated that she had no recollection of how she obtained the Monroeville address. (Doc. No. 41, App. B at 24). She indicated that she may have taken the address from Mylnar's owner's card. (Doc. No. 41, App. B at 25). Detective G. Tallent also expressed uncertainty as to how the Monroeville address was obtained. (Doc. No. 41, App. A at 25). When asked to explain why the police were provided with her mother's address, Micaela stated that she had given the police the Monroeville address because that is where she was "staying" at the time. (Doc. No. 41, App. C at 102). She made it clear that she was not asked to give her "address," and that she did not provide them with her Florida address only because she knew that they were likely to contact the parent who was in closer proximity to the area. (Doc. No. 41, App. C at 103). The statements of these individuals, while certainly not constituting conclusive proof that Micaela resided in Florida as of the date of the accident, are sufficient to preclude the grant of defendant's motion for summary judgment. It will be for the jury to resolve whether Micaela was a resident of her father's Florida household on that date.

In determining that summary judgment on the issue of Micaela's residency is inappropriate at this stage, the court expresses no opinion regarding the ultimate resolution of this issue or the credibility of the witnesses mentioned in this opinion. In determining the issue of Micaela's residency, a conclusion by the finder of fact that Micaela remained a resident of her mother's Monroeville household at the time of the accident will not preclude a determination that she was also a "resident" of her father's Florida household as that term is defined in the Policy.

23

This approach is consistent with Florida law, as the District Court of Appeal of Florida, Fourth District, explained in *Sutherland v. Glens Falls Insurance Co.*, 493 So.2d 87 (Fla. Dist. Ct. App. 1986):

> We are not saying the jury should have found in favor of appellants, but only that they could lawfully have done so.  According to case law, it is possible to have a residence–as opposed to domicile–in more than one place at the same time.

*Id.* at 87.  In *Sutherland*, the insurance policy at issue defined the term "family member" as "a person related to [the insured] by blood, marriage or adoption who [was] a resident of [the insured's] household."  *Id.* at 88.

In the instant case, the term "resident" is defined in the Policy to mean "the physical presence in [the insured's] household with the intention to continue living there."  Micaela's intention to "continue living" in her father's household, if she was already doing so as of July 12, 2003, is not itself disputed by defendant.  The only question is whether she had already established her "physical presence" there within the meaning of the applicable definition.  In the instant case, the Policy clarifies the definition by stating that "[the insured's] unmarried dependent children while *temporarily away from home* will be considered resident(s), if they intend to continue to live in [the insured's] household."  (Doc. No. 32, App. A)(emphasis added). This clarification, however, does not limit "insured person" status to "unmarried dependant children."  As noted earlier, one can be a "resident" under the Policy without being related to the insured.  Therefore, the extent to which Micaela was dependent upon her mother, as opposed to her father, has no dispositive effect with regard to the ultimate question of residency. Furthermore, the finder of fact may determine that Micaela was a resident of her father's household even if she was still living *primarily* with her mother as of July 12, 2003.  Any

24

contrary language in *Dwelle* relied upon by defendant is misplaced, given that the word

"primarily" appeared in the definition of "relative" in that case but does not appear in the

definition of "resident" in this case.  *Dwelle*, 839 So.2d at 898-99.

It will be for the jury to determine whether Micaela was a "resident" of her father's

Florida household on the date of the accident.  That determination, of course, will resolve

whether plaintiffs, as assignees of Micaela's alleged rights under the Policy, are entitled to a

recovery in this case.

**II.**   ***Bad Faith Statute Claim***

Plaintiffs also filed a claim against defendant pursuant to 42 PA. CONS. STAT. § 8371,

which provides:

> § 8371.  Actions on insurance policies
>
> In an action arising under an insurance policy, if the court finds that the insurer
> has acted in bad faith toward the insured, the court may take all of the following
> actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made
> by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 PA. CONS. STAT. § 8371.  Defendant contends that it is entitled to summary judgment on this

statutory claim advanced by plaintiffs.  Plaintiffs contend that there is a genuine issue of material

fact with respect to whether defendant acted in bad faith in refusing to provide coverage for

Micaela.

Under Pennsylvania law, "[b]ad faith will be shown where an insurer has for a frivolous

or unfounded reason refused to pay the proceeds of a policy to its insured."  *Hollock v. Erie Ins.*

*Exchange*, 842 A.2d 409, 416 (Pa. Super. Ct. 2004).  "This is so because an insurer has a duty to act with the utmost good faith towards its insured."  *Id.* at 416.  In *Terletsky v. Prudential Property and Casualty Ins. Co.*, 649 A.2d 680 (Pa. Super. Ct. 1994), the Pennsylvania Superior Court explained that "bad faith must be proven by clear and convincing evidence and not merely insinuated."  *Id.* at 688.  It is insufficient for plaintiffs to establish that defendant engaged in "mere negligence or bad judgment."  *Id.*  The superior court explained that, "to recover under a claim of bad faith, the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy and that defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim."  *Id.*  "Bad faith claims are fact specific and depend on the conduct of the insurer *vis a vis* the insured."  *Condio v. Erie Ins. Exchange*, 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006).

At the outset, it is worth noting that defendant relies on *Frog, Switch & Manufacturing Co. v. Travelers Insurance Co.*, 193 F.3d 742 (3d Cir. 1999), for the proposition that "where the breach of contract claim is dismissed on the merits, the bad faith claim asserted under Pennsylvania law also must be dismissed."  (Doc. No. 32 at 19).  This issue, however, need not be reached by the court in the instant case.  Having determined that plaintiffs' breach of contract claim cannot be resolved at the summary judgment stage, the court concludes that the "bad faith" issue must be analyzed independently in accordance with Pennsylvania law.

Defendant became aware of the accident on August 12, 2003, which was one month after it occurred.  On that day, Saulo placed a telephone call to defendant after receiving a letter from plaintiffs' attorney.  At that point, Saulo denied that Micaela had ever resided with him.  (Doc. No. 46 at 8).  Plaintiffs contend that Saulo's denial resulted from his fears regarding his

immigration status.  They also contend that Saulo informed plaintiffs' counsel that his statements to defendant were not accurate.  In an affidavit dated February 26, 2006, plaintiffs' counsel stated:

> 2.  Shortly after the July, 2003 motor vehicle accident that is the subject of this action, I was retained to represent the Plaintiffs.
>
> 3.  In the course of that representation, I attempted to schedule the deposition of Saulo DeSouza in Florida by serving him with a subpoena.
>
> 4.  In response to that subpoena, Saulo DeSouza called me on my cellular phone to request that the deposition be postponed, and to discuss the case.  During that telephone conversation, which took place while I was in my car and with the phone set on speakerphone, Saulo DeSouza explicitly stated to me, among other things, that he wished he had spoken to me before he had given his statement to Allstate because he would have given different information.  Saulo DeSouza further explained that he felt that he would have to stick with the story he had told to Allstate or he could be 'in trouble.'
>
> 5.  I immediately reported to counsel for Allstate the content of that conversation between myself and Saulo DeSouza, and I elected to postpone the deposition.

(Doc. No. 41, App. F).  Plaintiffs rely on this affidavit not only to establish that Saulo's statements regarding Micaela's residency were not credible, but also to establish that defendant was aware of the alleged unreliability of those statements.

In a letter dated September 22, 2003, Timothy J. McCarten ("McCarten"), an Allstate employee, informed Antonelli that defendant was disclaiming and denying "any and all liability or obligation to [Antonelli] or others" with respect to Micaela's accident.  (Doc. No. 39, Ex. K). In that letter, McCarten stated that the disclaimer was being made "because Micaela DeSouza [did] not meet the definition of an 'insured person' as indicated in Saulo DeSouza's policy." (*Id.*).  McCarten made no mention of the fact that Micaela did not have Mylnar's permission to operate the vehicle.  In fact, he specifically stated that the "vehicle would be categorized as a

27

'non-owned' auto under Saulo DeSouza's policy." (*Id.*).  Defendant contends that McCarten's

letter "did not comment on the permissive use issue because Allstate had been unable to

complete its investigation on that question." (Doc. No. 32 at 19).  According to defendant,

Mylnar and Antonelli had not been cooperating with the investigation.  Defendant further asserts

that "Allstate's earlier letter of August 25, 2003, had reserved rights to deny coverage on the

[permissive use] basis as well." (*Id.*).  Regardless of whether defendant was actually aware of

the permissive use issue as of September 22, 2003, the court is convinced that defendant's

concession that it had reached no conclusion with respect to the permissive use issue when it

denied the claim precludes defendant from relying on its permissive use rationale for purposes of

its motion for summary judgment on the statutory issue.  It is, of course, possible that an insurer

could defeat a statutory bad faith claim even though its basis for denying coverage to an insured

turns out to be incorrect.  Nevertheless, defendant cannot defeat the bad faith claim in the instant

case by adopting a "reasonable basis" for denial after the fact.  Defendant initially denied

coverage to Micaela solely on the basis of her alleged residency in Monroeville.  Therefore, the

court's present inquiry is limited to whether the undisputed facts of record demonstrate that

defendant's denial of coverage *on that basis* was "frivolous or unfounded." *Hollock*, 842 A.2d at

416.

     In a July 20, 2005, deposition, plaintiffs' counsel stated that he had spoken to McCarten

about statements made by Mylnar and Antonelli to State Farm, which was Mylnar's insurer.  He

stated that both Mylnar and Antonelli had indicated that Micaela was living with her father in

Florida as of the date of the accident.  (Doc. No. 39, Ex. J at 39-40).  McCarten was apparently

unable to obtain those statements because Mylnar and Antonelli were not cooperating.  (Doc. No.

41, App. G at 70-72).  Plaintiffs' counsel noted in his deposition that he had told McCarten that Mylnar was not obligated to cooperate because he was not defendant's insured, and that defendant had to do everything possible to obtain the statements.  (Doc. No. 39, Ex. J at 70).  Furthermore, plaintiff's counsel described a conversation in which he had been told by McCarten that defendant was still undecided when, in fact, the decision to deny coverage had already been made.  (*Id.* at 72).  This conversation apparently occurred on September 19, 2003, which was just three days prior to McCarten's letter to Antonelli denying coverage.  (*Id.*).

In *Condio v. Erie Insurance Exchange*, 899 A.2d 1136 (Pa. Super. Ct. 2006), the Pennsylvania Superior Court declared that the standard under which to measure the conduct of an insurance company for purposes of 42 PA. CONS. STAT. § 8371 is "whether the insurance company had a reasonable basis for its position or acted in reckless disregard of the absence of a reasonable basis."  *Id.* at 1145.  The superior court noted that "if evidence arises that discredits the insurer's reasonable basis, the insurer's duty of good faith and fair dealing requires it to reconsider its position and act accordingly, all the while remaining committed to engage in good faith with its insured."  *Id.* (internal quotation marks omitted).  It is important to remember that, at the summary judgment stage, the court must draw all inferences in the light most favorable to the nonmoving party.  The deposition of plaintiffs' counsel indicates that McCarten may have consciously disregarded the existence of evidence which undermined defendant's basis for denying coverage.  It is conceivable that a reasonable jury could conclude, on the basis of clear and convincing evidence, that defendant's decision to discontinue its investigation and to deny coverage at the time that it did was made in bad faith.  *Id.* at 1143 ("Bad faith must be shown by clear and convincing evidence.").   For purposes of the summary judgment motion filed by

29

defendant on this issue, plaintiffs adduced sufficient facts which preclude a grant of summary judgment in favor of defendant.  The ultimate resolution of this issue will rest with the finder of fact.

### *Conclusion*

AND NOW, this 25th th day of September, 2006, upon consideration of the cross-motions for summary judgment filed by defendant Allstate Insurance Company (Doc. No. 31) and by plaintiffs Pamela Trunzo, Robert Trunzo and Gina Trunzo (Doc. No. 34), **IT IS ORDERED** that plaintiffs' motion for partial summary judgment is **GRANTED** and defendant's motion for summary judgment is **DENIED**.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

cc: Counsel of Record